**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
——————————————————x

Sacha Peet and Renee Muza
on behalf of themselves and other similarly
situated,

Plaintiffs,

v.

Peak Outcomes, LLC d/b/a Duet Care at Home
Kyle Budinscak in his individual and official
capacities, jointly and/or severally Lauren
Gerndt, Kayla Noone, and Denise Bauer

Defendants.

_____x

**PLAINTIFFS' CLASS AND**
**COLLECTIVE COMPLAINT**


**JURY TRIAL DEMANDED**


Plaintiff Sacha Peet (Plaintiff Peet") and Plaintiff Renee Muza ("Plaintiff Muza") and

(hereinafter collectively "Plaintiffs"), by and through their attorneys, Julien Mirer & Associates,

PLLC on behalf of themselves, and those similarly situated, upon personal knowledge as to

themselves and upon information and belief as to other matters, allege as follows:


## NATURE OF ACTION

1.     This lawsuit seeks to recover unpaid minimum wage, overtime, unlawfully

withheld overtime premium, and statutory penalties for notice-and-recordkeeping violations for

Plaintiffs Peet and Muza all others similarly situated. Plaintiffs are former hourly employees who

worked at Defendants' companion care agency until their wrongful terminations for reporting

sexual harassment.

2.     Defendants have deprived Plaintiffs and their co-workers of minimum wage since

at least on or about April 18, 2022, in violation of the Fair Labor Standards Act ("FLSA").

1

3.      Defendants have deprived Plaintiffs of minimum wage, since at least on or about April 18, 2019 in violation of the New York Labor Law ("NYLL").

4.      Plaintiffs bring this action on behalf of themselves and similarly situated current and former employees who elect to opt-in to this action pursuant to 29 U.S.C. §§201 *et seq.* of the FLSA, and specifically, the collective action provision of 29 U.S.C. §216(b), to remedy violations of the wage-and-hour provisions of the FLSA.

5.      Plaintiffs also bring this action on behalf of themselves and similarly situated current and former employees pursuant to Rule 23 of the Federal Rules of Civil Procedure (Fed. R. Civ. P.) to remedy violations of Article 6, §§190 *et seq*., and Article 19 §§650 *et seq*. of the NYLL and the supporting New York State Department of Labor regulations.

6.      Plaintiffs further bring class-wide claims under the New York Labor Law for failure to pay minimum call-in pay as required to all hourly workers who worked any shifts less than four hours in the relevant class period from March 2, 2019, to the present.

7.      In addition, Plaintiffs bring claims for gender discrimination, hostile work environment and retaliatory wrongful termination under the New York City Human Rights Law ("NYCHRL") and retaliatory wrongful termination under the New York Labor Law Whistleblower provision  NYLL 740.

8.      As alleged more fully below, after Plaintiffs made repeated complaints regarding sexual harassment for themselves and female employees by a client.

9.      Further,  Plaintiff Peet asked Defendants about COVID policies and procedures for Companions and in regards to her Client's safety. Plaintiff Peet was then taken off of her client's schedule. Defendants were unable to provide a reason for termination.

10.     Plaintiff Muza was similarly subjected to reduced hours and wrongful termination after she complained about sexual harassment, being taken off the case and was

offered no comparable hours.

11.    Finally, Plaintiff Muza brings a NYCHRL aiding and abetting claim against Defendant Denise Bauer for her aiding and abetting of her brother, John Draghi's sexual harassment of Plaintiff Muza.

## JURISDICTION AND VENUE

12.    Jurisdiction is proper as this Court has original federal question jurisdiction under 28 U.S.C. § 1331 since this case is brought under the FLSA, 29 U.S.C. §§201, *et seq.* This Court has supplemental jurisdiction over the NYLL and NYCHRL claims, as they are so related that they form part of the same case or controversy under Article III of the United States Constitution.

13.    As stated below Defendants are an employer engaged in commerce as defined in the FLSA, 29 U.S.C. §203(s).

14.    Defendants are subject to personal jurisdiction in the State of New York since its headquarters is located in New York County, State of New York, and Defendants perform business there.

15.    Venue is proper in this District because Defendants conduct business in this Judicial District, and many of the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

16.    Plaintiff Renee Muza is an adult female resident of Kings County, New York.

17.    Plaintiff Muza was employed by Defendants from on or about March 20, 2023 to September 27, 2024.

18.    Plaintiff Sacha Peet is an adult female resident of Kings County, New York.

19.    Plaintiff Peet was employed by Defendants from on or about March 15, 2023, to December 07, 2023.

3

20.    Defendant Peak Outcomes, LLC d/b/a Duet Care at Home (hereinafter "the Company" or "Duet") is a privately owned home care and companion provider with offices in New York County.

21.    Upon information and belief, based on information provided by Plaintiffs, as former employees of Defendants' Company is an enterprise whose annual gross volume of sales made, or business done, is in excess of $500,000.

22.    As such, based on Plaintiffs' personal knowledge of Defendants' business, as well as upon information and belief, Defendants are an enterprise engaged in commerce as defined by 29 U.S.C. §203.

23.    Further, The Company has more than 40 employees and is an employer under the NYLL and the NYCHRL.

24.    Duet employs 201-500 employees at any given time.

25.    Defendant Kyle Budinscak is an adult male resident of New York and is Managing Director for Duet.

26.    Defendant Budinscak is the owner and co-manager of Duet.

27.    Defendant Lauren Gerndt is an adult female resident of New York and is the Staffing Manager for Duet.

28.    Defendant Kayla Noone is an adult female resident of New York and is Director of  Client Services for Duet.

29.    Defendant Denise Bauer is an adult female resident of New York and is the sister of Duet's client, John Draghi.

30.    All individual Defendants exercised control over Plaintiffs' schedule, pay, and working conditions and exercised the right to hire and fire Plaintiffs, as well as that of the putative collective and class action members.

4

31.     Each Defendant jointly and severally employed Plaintiffs at all times relevant to this complaint.

32.     Each Defendant has had, individually and jointly, substantial control over Plaintiffs' wages, hours and working conditions.

## **FACTUAL ALLEGATIONS**

## **WAGE VIOLATIONS**

### **Off the Clock Unpaid Time**

33.     Upon each Plaintiff's hire, they were, as were all new Company hires, required to attend a two-hour unpaid orientation and onboarding at the Company's Manhattan office.

34.     Further, under the NYLL Plaintiffs should have been paid for a minimum 4-hour shift in connection with the orientation.

35.     At all times relevant during their employment with Defendants, Plaintiffs spoke with the case managers and main office for approximately half an hour per week or more outside of scheduled time with clients and received no compensation whatsoever in connection with these critical work-related communications.

36.     Further, Plaintiffs and all employees were required to use a punch clock under the SwyftOps system, that recorded time in 15-minute increments.

37.     When Plaintiffs began work early, as they were required to by at least 10 minutes for pick-up shifts with clients who were not regularly assigned to them, this time was not credited to them.

38.     Similarly, when Plaintiffs were required to stay late after their shift, to the extent the time was less than fifteen minutes, Plaintiffs and the putative class were paid nothing for this time.

39.     Indeed Defendants admitted to Plaintiff Peet "Our system clocks time in 15 minute increments so unfortunately, staying 5 minutes late here and there will not be captured."

40.     Upon information and belief, no Duet employees were paid for 1) their two-hour orientations, and they were required to be paid 4 hours under the NYLL for this time; 2) nor for calls with the company related to work outside of their client shifts; 3) nor for time worked before or after their scheduled shifts, when that time amounted to less than fifteen additional minutes on either end of the shift.

**Call In Violation**

41.     In addition, meetings with potential clients were ordinarily one hour, and Company employees were paid only for that hour.

42.     For example, on two occasions, Plaintiff Muza was required to attend a one-hour meeting with a potential client.

43.     Plaintiff Muza was paid only one hour for this time.

44.     Defendants failed to pay Plaintiffs and the putative class for a shift of a minimum of four hours as required by 12 NYCRR § 142-2.3.

45.     This minimum four-hour rule also applied to the 2 hour orientation where Plaintiffs were paid nothing and where they should have been paid for four hours.

46.     Upon information and belief, no Duet employees were paid for four hours as required when they worked shifts less than four hours. This failure to pay the minimum shift length as required was widespread and done as part of a general Company policy and practice applicable to all Defendants' employees in the relevant period.

**Common Wage Allegations**

47. For named Plaintiffs whose individual factual allegations are stated below, (and except

those specifically noted) the following common facts apply to each of the named Plaintiffs as well as all those similarly situated:

- At all times relevant, Defendants failed to pay Plaintiffs and members of the class and collective action minimum wage for the two-hour orientation program. Thus, Defendants have failed to pay Plaintiffs in accordance with the minimum wage provisions of FLSA, 29 U.S.C. § 206, and NYLL § 652 and should in fact, have paid them for a four-hour minimum shift in connection with this time.

- At all times relevant, Defendants failed to pay Plaintiffs and members of the class and collective action minimum wage in connection with calls with management case workers made outside of the time Plaintiffs were actually scheduled to provide client services. Thus, Defendants have failed to pay Plaintiffs in accordance with the minimum wage provisions of FLSA, 29 U.S.C. § 206 and NYLL § 652.

- At all times relevant, Defendants failed to pay Plaintiffs and members of the class and collective action minimum wage in connection with time worked before and after their scheduled shift to the extent such time was less than 15 minutes on either end, as their clock did not record such time. Thus, Defendants have failed to pay Plaintiffs in accordance with the minimum wage provisions of FLSA, 29 U.S.C. § 206, and NYLL § 652.

- At all times relevant, Defendants knowingly violated 12 NYCRR ¬ß 142-2.3 by their widespread pay practice of failing to pay call-in pay as required to Plaintiff Muza and all other hourly employees who performed work for less

than four hours at a time, including but not limited to interviews with potential clients. Defendants were required to pay Plaintiffs four hours for each shift less than four hours.

## FLSA COLLECTIVE ACTION ALLEGATIONS

48.     Named Plaintiffs bring their first claim for relief as a collective action under Section 16(b), 29 U.S.C. § 216(b) of the FLSA on behalf of all hourly workers employed by Defendants between on or March 2, 2022 and the date of final judgment in this matter that elect to opt-in to this action. Such Plaintiffs are hereinafter referred to as the "FLSA Collective Plaintiffs."

49.     Defendants committed the acts alleged in this complaint knowingly, intentionally, and willfully within the meaning of FLSA, 29 U.S.C. § 216.

50.     At all times relevant to this complaint, and upon information and belief, named Plaintiffs and the FLSA Collective Plaintiffs are and/or have been similarly situated, and have had substantially similar compensation provisions. Thus, the claims of Plaintiffs are essentially the same as those of the FLSA Collective Plaintiffs.

51.     Named Plaintiffs and the FLSA Collective Plaintiffs have been subject to Defendants' policies and practices of willfully failing to pay them in accordance with minimum wage requirements in violation of FLSA, 29 U.S.C. § 206.

52.     For notice and all other purposes related to claims brought under FLSA, 29 U.S.C. § 216(b), the names and addresses of the FLSA Collective Plaintiffs are available from Defendants' records. Notice can be provided via first-class mail to the last address known to Defendants for each of the FLSA Collective Plaintiffs.

## RULE 23 "CALL IN PAY" and MINIMUM WAGE CLASS ALLEGATIONS

53.      Plaintiffs bring their second cause of action for failure to pay minimum wage for

orientation and calls to the office outside of their client shifts and for failure to pay for time worked before and after scheduled shifts where such time was less than 15 minutes on either side, pursuant to Rule 23 of the Fed. R. Civ. P.,  on behalf of all hourly workers employed by defendants at between the limitation period and the date of final judgment in this matter.

54. Plaintiffs bring their third cause of action for failure to pay minimum wage for four hours for all shifts less than four hours ("call in pay" claim ) pursuant to Rule 23 of the Fed. R. Civ. P., on behalf of all hourly workers employed by defendants between the limitation period and the date of final judgment in this matter.

55.    **Class Definition:** Plaintiffs bring their second and third claims for relief pursuant to Rule 23 of the Fed. R. Civ. P., on behalf of all hourly workers employed by Defendants between the limitation period and the date of final judgment in this matter.

56.    **Class Definition:** All employees who attended orientation in the relevant period, all employees who communicated with the Company outside of scheduled client shifts in the relevant period, and all employees who performed shifts of less than four hours.

57.    **The Identity of Class Members Are Readily Ascertainable**: The Class members are readily ascertainable since the identity, addresses, time records, work schedules, positions, and rates of pay for each Class member are determinable from the Defendants' records that were required to have been kept under FLSA, and the NYLL. Notice can be provided pursuant to Rule 23 of the Fed. R. Civ. P.

58.    **Numerosity:** Joinder of all members of each Class  is impracticable since, upon information and belief, there are more Class members than 40. The exact number of Class members is presently unknown to Plaintiffs  since all facts and records necessary for precise calculation are

in the sole possession and control of the Defendants. Because of the foregoing, it will benefit the parties to address their claims as Class.

59.    **Typicality:** The Plaintiffs' claims are typical of those claims which could be alleged by any member of the Class. The relief sought by Plaintiffs are typical of the relief which would be sought by each member of the Class in separate actions. All class members were subject to the same policies and practices alleged herein including Defendants' failure to pay minimum wages, and call in pay. The aforesaid policies and practices of Defendants similarly affect all Classmembers. Plaintiffs and Class members have sustained similar injuries and damages as a result of Defendants' unlawful acts and/or omissions.

60.    **Adequacy of Representation:** Plaintiffs are fit to fairly and competently represent and protect the interests of the Classes. For the purposes of this action, Plaintiffs have no interests that conflict with those of the Class. Plaintiff attorneys have considerable experience in the field of employment litigation as well as class action litigation.

61.    **Superiority of the Class Mechanism:** Disposition of Plaintiffs' claims as a class action with the class is superior to any other available means of adjudication for the foregoing reasons:

- Class members are low-wage workers who individually lack the necessary resources to effectively litigate against a corporate Defendant;

- A class action is in the interests of judicial economy as individual litigation would result in the expenditure of considerable public resources;

- Injuries suffered by each Class member individually are small in comparison to the cost of individual litigation, dissuading and precluding redress of their claims;

- The claims shared by Class members involve important public policy interests that would otherwise go unaddressed due to aforesaid barriers to and limitations of individual litigation, and;

- A class action will provide anonymity for those Class members whose fear of retaliation would otherwise dissuade them from asserting their rights. Upon information and belief, some Class members are still employed by Defendants.

62. **Commonality** Questions of law and fact are common to all class members and predominate over those of any individual class member, including:

- Whether Plaintiffs and Class members were paid minimum wages under the NYLL for orientation;

- Whether Plaintiffs and Class members were paid minimum wages under the NYLL for calls and emails to the company outside of scheduled client shifts;

- Whether Plaintiffs and Class members were paid for four hours when they worked shifts less than four hours, including but not limited to the orientation and calls with prospective clients for example;

- Whether Defendants had any method to keep track of the hours Plaintiffs and Class members worked;

- Whether Defendants paid Plaintiffs and Class members solely for scheduled hours rather than actual hours;

- How the SwyftOps clock system operated;

- Defendants practice and policy of willfully violating Plaintiffs and Class members rights under the NYLL.

**CLASSWIDE FACTUAL ALLEGATIONS**

11

63.    Defendants committed the acts alleged in this complaint knowingly, intentionally, and willfully.

64.    Defendants knew that the nonpayment of the call-in pay minimum of four hours per shift would economically injure Plaintiffs and violate New York State laws.

65.    Defendants knew that the nonpayment of minimum wage for orientation and calls to the office outside of client shifts and failure to pay workers when they arrived to work early or were required to work late, where such additional time was less than 15 minutes on either side of their scheduled shifts would economically injure Plaintiffs and violate New York State laws.

66.    Defendants knowingly violated 12 NYCRR § 142-2.3 by their widespread pay practice of failing to pay call-in pay as required to Plaintiffs and all other hourly employees who performed work for less than four hours at a time, including but not limited to interviews with potential clients.

67.    Defendants knowingly violated NYLL 650 by their failure to pay minimum wage as required for all hourly employees for their 2 hour employee orientation and for all calls and emails to case managers outside of time scheduled with clients, and for when they arrived to work early or were required to work late, where such additional time was less than 15 minutes on either side.

68.    Defendants committed the foregoing acts against the Plaintiffs and members of the Class.

## INDIVIDUAL ALLEGATIONS

**Plaintiff Sacha Peet**

69.    Plaintiff Sacha was hired by Defendants on or about March 15, 2023 after being

interviewed by the Company.

70.     On the day of her hire, Plaintiff Peet was required to attend a 2-hour orientation as part of her job.

71.     This mandatory assignment was entirely unpaid.

72.      On March 30, 2023, Connor Robertson, Duet Staffing Assistant, spoke to Plaintiff Peet about a client, Mr. Draghi. He shared notes on Mr. Draghi which did not include any history of inappropriate behavior or comments. On the contrary, Mr. Robertson told Plaintiff Peet that Draghi was "one of the fun ones!".

73.     On March 31 and April 3, 2023, Plaintiff Sacha Peet began work with Mr. Draghi as a Companion to cover two shifts for one of his other companions.

74.     Mr. Draghi then requested that Plaintiff Peet be added to his permanent schedule, replacing another companion.

75.     On April 10, 2023, Plaintiff Peet was permanently added to Draghi's schedule as one of his companions.

76.     Plaintiff Peet assisted Draghi with errands, household tasks, and taking care of his dog. She acted as a personal secretary to Draghi. Plaintiff Peet would assist him with walking, and he insisted on holding onto her arm despite having a cane.

77.     As soon as Plaintiff Peet began her assignment with him, Draghi made inappropriate comments about her physical appearance and would comment that she "was in good shape", "looked good", and "men were probably interested in you and lining up [to date you]", "how lucky her boyfriend is to be with her". Mr. Draghi would ask questions about her boyfriend at the time, asking "What does he do?" and "Why are you with him?".

78.     Draghi would continue to pry into her personal life by asking her inappropriate questions such as "What medications are you on?".

79.    Mr. Draghi also repeatedly referred to Plaintiff Peet on a daily basis as "babe."

80.    Plaintiff Peet was shocked, as she had not received any indication or warning from  Defendants to be prepared for such inappropriate behavior from Draghi.  She was instead told there was no reason for concern and that Draghi was a safe person.

81.    Due to the unwanted sexual advances, Plaintiff Peet felt unsafe in the environment and dreaded going to work.

82.    Nonetheless, Plaintiff Peet continued to do her job as she needed the work and did not want to anger the client.

83.    In order to deal with the daily unwanted advances, as best she could Plaintiff Peet tried to change the subject.

84.    Draghi repeatedly attempted to get Plaintiff Peet to call or text him after she clocked out. It is documented in Draghi's initial case notes that he would communicate with another companion after hours. Plaintiff Peet later realized that Duet should have flagged that issue from the start.

85.    Draghi pressured Plaintiff Peet to wear her workout clothes and use the fitness room with him.

86.    Draghi regularly pressured Plaintiff Peet to hug him. He made the point to have his female house cleaner hug him in front of Plaintiff Peet, stating, "See, everyone hugs me."

87.    On April 28, 2023, Plaintiff Peet called Duet and spoke with Defendant Kayla Noone to express her discomfort with Draghi.

88.    Plaintiff Peet shared Draghi's inappropriate comments about her personal life and expressed feeling  uncomfortable with him crossing her boundaries. Plaintiff Peet asked for advice and direction on responding to these concerns.

89.    Noone failed to provide meaningful advice, training, or strategy and instead

advised Plaintiff Peet that "he was harmless" and it was up to her to establish boundaries with Draghi.

90.      Given the report of harassment, in violation of Defendants' policy handbook, which prohibits harassment by clients as well as employees, they utterly failed to enforce its own policy, to take any corrective action, or to launch an investigation.

91.      Plaintiff Peet was required to handle the situation on her own.

92.      Shortly afterward, Noone emailed Plaintiff Peet, asking Plaintiff Peet to let her know how it goes with Draghi and stated she was there to support her despite not providing any concrete new steps on addressing Draghi's behavior.

93.      Like Plaintiff Muza would be, Plaintiff Peet was left to handle the situation on her own in violation of the company's policy and without any assistance from the company.

94.      On May 4, 2023, Plaintiff Peet followed up with the company to ask if Noone spoke with Draghi, and she was told that Ms. Noone had not spoken with Mr. Draghi about boundaries.

95.      On May 29, 2023, Plaintiff Peet was offered a second shift to work Saturdays with Draghi, which would have provided her 16 hours of work per week.

96. Plaintiff Peet planned to take on the additional shift out of financial necessity, despite being uncomfortable with his behavior, and despite Plaintiff Peet's family expressing concern for her spending more time in Draghi's home and being subjected to inappropriate comments.

97.      From the outset, Plaintiff Peet had indicated that she was seeking 16-20 hours work per week, and the only time she was offered an increase in shifts was with Draghi, who the company knew to be harassing her.

98.     On May 30, 2023 Plaintiff Peet requested a rate increase from Defendant Noone in order to take on the additional shift with Draghi, based on her extensive related experience and expressing concerns that the work was challenging, not as advertised and complaining about unpaid time.

99. On May 31, 2023 Plaintiff Peet was informed that the shift she had been offered was instead given to another companion.  The companion in question in fact was Plaintiff Muza.

100.    On June 1, 2023, Plaintiff Peet reiterated her request for a rate increase via email, citing her "personal boundaries pushed regularly," among other complaints and further informed the company that she was not being paid for time worked before and after her scheduled shifts.

101.    On June 5, 2023, Defendant Noone replied, admitting the violation stating "Our system clocks time in 15-minute increments so unfortunately, staying 5 minutes late here and there will not be captured."

102.    Defendants were thus knowingly "shaving time" off of all their employees' hours by programming their punch clock to lower the reported actual hours worked.

103.    Noone in turn offered Plaintiff Peet a one dollar raise but did not remedy the global pay violation she admitted or correct the timeclock.

104.    Further, throughout her  employment, Plaintiff Peet was required to be on email, on texts and on calls, at least an hour per week on average in addition to her scheduled, paid client time, and received no pay whatsoever for this additional unscheduled time.

**Sexual Assault By Client And Defendants' Failure to Remedy**

105.    After Plaintiff Peet's complaint, she continued to experience harassment during her weekly shifts and continued to be subjected to underpayment,

106.    On June 26, 2023, Draghi inappropriately slapped Plaintiff Peet's buttocks/upper thigh with his hand while they were both alone in his office.

107.    Plaintiff Peet was shocked and told him that was "not okay " and told him that his inappropriate touching made her uncomfortable and that he should not be touching her for any reason.

108.    The next day, on June 27, 2023, Plaintiff Peet complained to Noone about Draghi slapping her buttocks/ upper thigh.

109.     On June 28, 2023, Noone emailed Plaintiff Peet. She did not offer to address Draghi's behavior, place him on suspension, or offer Plaintiff Peet paid leave.

110.    On June 29, 2023, Plaintiff Peet emailed Noone, responding that she believed that Draghi's inappropriate behavior was being brushed off as if he didn't know any better. She expressed that Draghi pushes boundaries to see what he can get away with.

111.    Plaintiff Peet expressed concern and complained that she was never warned about Draghi's past inappropriate behavior after she explicitly asked if there was "anything else important I should know that was not in the written documents." If she had been properly briefed on his record of being inappropriate, she would have protected her personal boundaries better from the start. Plaintiff Peet asked Noone about the prior history of any harassment by Draghi and requested that the other companions be contacted and asked if Duet could offer any reassurances on how his behavior would be addressed.

112.    Noone responded that same day, confirming a history of harassing comments by Draghi and apologizing that Plaintiff Peet was not briefed. She further stated that his file had been updated so:

> "John's file has a note so that all staff members are conveying an accurate picture of John's potentially inappropriate comments and I will update it to include your report of physical touch. To address your question about how his behavior will be addressed if it continues, if John's behavior escalates or becomes difficult to redirect, we may need to staff only male companions with John. I will personally call each of his other companions to ensure they have not been experiencing uncomfortable interactions that they have not reported to Duet."

"I know that this coming Monday 7/3 has already been cancelled, but given your characterization of John and your experience with him, it seems best that you not return for future visits. This is no way a punitive action, nor does it reflect poorly on you in any capacity."

113.    Thus on or about June 29, 2023, Plaintiff Peet was taken off the schedule. She received no replacement shifts or paid leave.

114.    Plaintiff Peet's schedule was reduced as a direct result of complaining about the client's conduct in violation of the Company's policies and the laws.

115.    Noone did not reference the anti-harassment policy. Nor did she initiate an investigation or take any action whatsoever against Draghi.

116.    Rather, she deprived Plaintiff Peet of work she desperately needed as retaliation for making a complaint of sexual assault.

117.    Further, despite her assurances to the contrary, Noone did not contact other companions.

118.    As set forth below, Plaintiff Muza began working with Draghi shortly after Plaintiff Peet did, and though she would learn of the incident by overhearing Draghi reference it on a phone call, she was never contacted in connection with this incident as Noone explicitly promised Plaintiff Peet she would do in her June 29, 2023 email.

119.    Nor did Noone or the Company in fact place Defendant with male companions going forward as promised.

120.    Nor did they take corrective action as promised when they received further reports of harassment and escalations from Plaintiff Muza as set forth below.

121.    Instead, in violation of the law and their own harassment policy, Duet Defendants continued to place female companions with Mr. Draghi and simply fired them when they complained.

122.    On June 30, 2023, Plaintiff Peet emailed Noone and expressed that she was glad that Noone was going to reach out to other companions to ensure their safety and that she enjoyed her work as a companion and would like to be paired with a client who was a better match. She was not aware that Defendants had no intention of disclosing this fact or taking corrective action.

123.    Though Noone had stated that the decision to take Plaintiff Peet off Draghi's case was not punitive and Plaintiff Peet would be considered for permanent placement with other clients, it was more than 2 months before she was placed with another client on October 5, 2023.

124.    Indeed, after she was removed from Mr. Draghi's schedule, Plaintiff Peet had zero shifts between June 27 – August 9th, and zero shifts again between August 27 – October 4th, 2023.

125.    During these periods, as throughout her employment, Plaintiff Peet had numerous calls with management regarding clients during this time, all of which were unpaid.

126.    Throughout this period, Plaintiff Peet actively attempted to pick up more coverage shifts and new client cases to avoid being financially damaged, but she was only given a few isolated coverage shifts for other Companions on an irregular basis.

127.    When she received a replacement client placement on October 5, 2023, Plaintiff Peet was restored to approximately 8 hours a week, but with her commute time doubled to 4 hours per week, working approximately two 4-hour shifts per week with her new client.

128.    On December 07, 2023, Plaintiff Peet's client tested positive for COVID.

129.    Plaintiff Peet notified the company of her client's COVID-positive status during her shift. Plaintiff Peet was not informed that she would receive hazard pay, even though the Company was paying hazard pay to other workers who had not made complaints to the company and who performed the same or similar work.

130.    Plaintiff Peet questioned the company about their COVID policies and practices for companions.

131.    In turn, the Company responded by Gerndt calling Plaintiff Peet to inform her that she was again being taken off the schedule of her new client. She was given no reason as to why she was being taken off and Defendants only referred to Plaintiff Peet no longer being a "good fit" or words to that effect.

132.    When Plaintiff Peet tried to log in to her SwyftOps account the following week she was devastated to find that her account no longer existed, thus confirming her wrongful termination. She also found she was no longer receiving texts and emails from the company for coverage shifts or opportunities with new clients.

133.    Previously, she had expressed that she wished to keep working and was shocked to be terminated.

134.    Plaintiff Peet was thus subjected to a retaliatory reduction in hours only to be subjected to retaliatory termination months later on December 8, 2023.

135.    Had Defendants enforced its own harassment policy, Plaintiffs Peet and Muza never would have been harassed to the full extent that they were, and the November 2023 and June 2023 incidents of harassment could have been entirely avoided.

136.    Instead, Defendants engaged in a pattern of tolerating Draghi's serial harassment, continuing to place female employees with Draghi even as they knew better, and terminating female employees who complained.

**Plaintiff Muza**

137.    Plaintiff Muza began work with Defendants in mid-March 2023.

138.    Plaintiff Muza, like all other employees, attended a 2-hour unpaid orientation at Defendants' Manhattan office.

139.    This orientation occurred after she was already interviewed, selected for hire and submitted her onboarding documents. Orientation was a mandatory job task.

140.    Throughout her employment Plaintiff Muza was required to use a timeclock that per Defendants, "clocks time in 15 minute increments" and did not accurately capture Plaintiff Muza's actual hours worked and which underreported her time worked when she arrived early or stayed late by less than 15 minutes, which she did at various times.

141.    Further, throughout her employment Plaintiff Muza was required to be on texts and on calls and email for at least an hour per week in addition to her scheduled, paid client time, and received no pay whatsoever for this additional unscheduled time.

142.    Throughout her employment, Plaintiff Muza was required to attend various one hour meetings with potential clients and she was paid only for the one hour, not for four hours as required under the NYLL.

143.    Plaintiff Muza began work with Defendants' Client John Draghi ("Draghi") on April 28, 2023, as a companion.  She worked one shift per week with Draghi and was increased to 4 shifts weekly by September 2023.

144.    Plaintiff Muza was not a home health aide. She did not assist Draghi with dressing, changing, toileting, or other physical care needs.

145.    Plaintiff Muza assisted Draghi with errands and household tasks. She acted as a personal secretary to Draghi.

146.    Between April 2023 and May 2024, Plaintiff Muza experienced many instances of sexually harassing behavior from Draghi while working her shifts, nearly on a daily basis. During that window of time, she repeatedly called Defendant Lauren Gerndt ("Gerndt") to report Draghi's pattern of behavior, which included asking for hugs, asking her to be his

girlfriend, calling her Mrs. Draghi, asking her to stay late or overnight, asking her to do drugs with him, and making sexual comments about her physical appearance. Plaintiff Muza tried to make light of them and redirect his attention whenever he made these comments by changing the subject or otherwise disengaging from the interaction. Plaintiff Muza found the comments and behavior very distressing because the incidents were becoming more severe over time, and that informed her response to the two later occasions when he had his pants open in front of her, on the jobsite.

147.    Plaintiff Muza repeatedly reported the incidents with Draghi to Gerndt by phone and email, and to the best of her recollection, Gerndt told her to establish boundaries with Draghi. During these repeated communications with Gerndt, she did not reference the anti-harassment policy or communicate that she would begin an investigation, nor did she say she would speak with him. Plaintiff Muza was left to handle it on her own. Defendants took no corrective action.

148.    On or around June 27, 2023, Plaintiff Muza overheard Draghi talking on the phone with someone. She did not know who he was talking to, but he described touching another Companion employed by the Company.  He also said that the Company contacted him to express that the Companion was upset by the behavior, and she would no longer be working with him. Plaintiff Muza understood this to be sexual touching based on her experience with Draghi's behavior and due to Draghi's description of the workers' response. Plaintiff Muza later learned that the individual referenced is Plaintiff Peet.

149.    Plaintiff Muza was extremely distressed by Duet's lack of communication regarding Draghi sexually touching another female Companion, given she was already subjected to unwanted sexual comments.

150.    Plaintiff Muza was surprised that no one from Duet called her to check in whether she was safe, inquire about whether she was experiencing anything similar with Draghi, or inform her of what happened in regards to Plaintiff Peet.

151.    Plaintiff Muza was concerned that Duet was abdicating their duty to keep employees safe. Indeed, at this time, Duet was deliberately misleading Plaintiff Peet to believe that they had informed other employees of Draghi's behavior when in fact they were actively concealing these facts even as they were receiving multiple complaints of harassment from both Plaintiffs independently, in which these complaints overlapped in time.

152.    Indeed, it was clear to Plaintiff Muza that Defendants were aware that they were exposing her to sexual harassment by placing Plaintiff Muza with Draghi.

153.    In or about November 2023, Draghi pulled down his pants in her presence. Ms. Muza was shocked and asked Draghi to pull up his pants. Plaintiff Muza verbally reported his behavior to her supervisor. The supervisor did not take any corrective action at that time to ensure that the incident did not occur again. Plaintiff Muza asked Duet to inform Denise Bauer ("Bauer"), Mr. Draghi's sister, who was involved in Draghi's care, about the incident, and they told her that they would.

154.    Plaintiff Muza reasonably understood Draghi's state of undress as sexual as for the entirety of her assignment Draghi made sexual advances towards her on a daily basis.

155.    Mr. Draghi would refer to Plaintiff as "his girlfriend" and "Mrs. Draghi" and referred to her as "a babe" on a daily basis.

156.    He would refer to Plaintiff Muza and himself as "mom" and "dad" to his dog.

157.    He always referred to Plaintiff Muza as "pretty" and made comments about her "figure".

158.    He would repeatedly request hugs.

159.    He would repeatedly request that Plaintiff Muza not leave at the end of her shift.

160.    He repeatedly asked if Plaintiff Muza wanted to move in with him.

161.    On one occasion, he requested that Plaintiff Muza buy him cocaine and invited her to sleepover and do cocaine with him.

162.    On at least a weekly basis, he made it clear to Plaintiff Muza that he wanted a romantic relationship with her.

163.    These unwanted comments occurred for the entirety of Plaintiff Muza's assignment with Draghi.

164.    On one occasion Plaintiff Muza was joining Draghi and his ex-wife for a lunch meeting with a real estate broker. En route to the meeting, Draghi commented that his "ex-wife would be jealous when she saw" Plaintiff Muza.

165.    He further stated that Muza should "pretend to be his girlfriend" to make her jealous, including "blowing into his ear." Muza redirected the conversation. Draghi made a "sad face" indicating his disappointment that Muza was not going along with his suggestion.

166.    Draghi would repeatedly introduce Plaintiff Muza to others as his "friend," further blurring the line between personal and professional roles.

167.    Draghi would repeatedly make plans for dinners and lunches during Plaintiff Muza's shifts and often took photos of the two of them together as though their relationship was personal and not professional.

168.    Plaintiff Muza often prepared meals for Draghi. On at least one occasion he referred to Muza as "a good homemaker."

169.    On at least one occasion Draghi asked Plaintiff Muza if she wanted to have kids someday.

170.    On at least one occasion, he asked Plaintiff Muza if she had "daddy issues."

171.    On one occasion Plaintiff Muza was present during a visit with Draghi's two sons. After their visit, Draghi commented that his sons "probably wish Plaintiff Muza was their mom instead" of their mother, Draghi's ex-wife.

172.    These cumulative incidents occurred with such frequency that they were a term and condition of Plaintiff Muza's employment.

173.    At all times, these advances were unwanted.

174.    On her initial call with Gerndt regarding the assignment on Friday, April 28, 2023, Plaintiff was cautioned by Gerndt that it was important to establish boundaries with Mr. Draghi and that he might ask whether she had "any friends who might want to date" him.

175.    Indeed, if Duet had taken appropriate action in connection with Ms. Peet, Ms. Muza never would have been exposed to Draghi in November 2023.

176.    In or around late January 2024, Draghi sent flowers to Plaintiff Muza's home address. As a result, on or around January 29, 2024, Plaintiff Muza emailed Gerndt to inform Duet that she would like to reduce her shifts with Draghi.

177.    In her email, Plaintiff Muza asked Gerndt to reduce her schedule by one shift per week, reducing her schedule to 24 total hours per week. Plaintiff Muza tried to call Gerndt over the next two days to discuss Draghi's repeated unwelcome verbal advances and other harassment, including the November 2023 incident where he pulled his pants down in front of her. Gerndt did not pick up the phone during that two-day period.

178.    On or around January 31, 2024, Plaintiff Muza called Defendant Bauer, to obtain guidance on working with him because of the recent incidents of harassment. She did not say anything on the phone in response to Plaintiff Muza's statements about Draghi's harassment. Right after the phone call, Ms. Bauer stated in a text message that she understood that Plaintiff

Muza needed to reduce her hours "take care of [her]self."

179.    In or around February 2024, Plaintiff Muza exchanged multiple emails with Gerndt about scheduling. In or around late February 2024, Gerndt emailed her to confirm that Duet reduced her schedule with Draghi to three shifts per week, putting Plaintiff Muza's schedule with Duet at 24 hours per week. During that time, Gerndt did not offer her any other shifts to help her maintain a 32-hour-per-week schedule.

180.    On or around March 1, 2024, Plaintiff Muza started her new schedule with Draghi and began working three shifts a week, equating to a 24-hour-per-week schedule.

181.    On or around May 7, 2024, Plaintiff Muza emailed Gerndt again to express concerns about Draghi's  continued inappropriate and unwanted sexually harassing behavior, stating that they were distressing to her "as a woman working alone in John's home."  That same day, Gerndt responded to Plaintiff Muza's email and asked Plaintiff Muza for a phone call to discuss her concerns about working with Draghi.

182.    Later that day, Noone called Plaintiff Muza to discuss Ms. Muza's concerns about working with Draghi. She reiterated that Draghi had a pattern of inappropriate and unwanted sexually harassing behavior.

183.    During the call, Noone indicated that she was collecting information about Plaintiff Muza's experiences, even as she was well aware of the sexual assault and other harassment of Plaintiff Peet by Mr. Draghi.

184.    Noone did not offer Plaintiff Muza any new shifts or opportunities to work with new clients. She also did not reference the anti-harassment policy or say that she would begin an investigation, nor did she say she would speak with Mr. Draghi.

185.    Plaintiff Muza continued to work her scheduled shifts with Draghi without receiving help from Defendants in managing his behavior. As a result, Plaintiff Muza was left to

handle it on her own even as the situation had not improved since her earlier conversations with the Company.

186.    On or around June 9, 2024, Plaintiff Muza arrived to her shift at Draghi's house. Draghi opened the door with his pants wide open and unzipped. She was shocked and feared for her safety. Based on previous instructions from Gerndt, Plaintiff Muza opted to redirect Draghi's attention to a number of tasks on his schedule that day.

187.    Later that night, Plaintiff Muza called Draghi's sister, Denise Bauer. Plaintiff Muza called her to discuss the incident. Bauer claimed that she did not know that Draghi had dropped his pants previously. Plaintiff Muza expressed concerns to her about workplace safety for female Companions assigned to work with Draghi. Bauer informed her that she did not believe that Draghi would accept to work with male Companions.

188.    Indeed, after Plaintiff Peet was wrongfully terminated in December 2023, the Company continued to schedule female companions with Mr. Draghi, even as they had received multiple complaints and as they had themselves told Plaintiff Peet a year earlier, in June 2023, that they were considering scheduling Mr. Draghi only with male companions.

189.    Upon information and belief, the Duet Defendants continued to schedule only female employees with Draghi because  Defendant Bauer would not permit them to do otherwise –just as Defendant Bauer stated to Plaintiff Muza.

190.    Defendant Bauer continued to insist that female employees be placed with Draghi despite her knowledge that they were being harassed by Draghi.

191.    Accordingly, Defendant Bauer aided and abetted the Duet Defendants' discrimination.

192.    Indeed, in February 2024, another female companion, Addy Birkes, began to work with John Draghi.

193.    Duet informed her that Draghi "might make comments" but did not mention anything physical, or that he had pulled down his pants despite the extensive complaints.

194.    Duet failed to update Draghi's file with this information and knowingly placed women in harm's way by their failure to do so.

195.    On or around June 10, 2024, Plaintiff Muza spoke with Kayla Noone ("Noone") on the phone about the incident on June 9, 2024, when Draghi approached her with his pants wide open. Plaintiff Muza asked to reduce her schedule with Draghi from three to two shifts a week. They agreed that she would take a paid sick day on her next shift with Draghi, on or around Thursday, June 13, 2024. Plaintiff Muza expressed concerns about workplace safety to Noone and stated that the Employer should protect its employees from inappropriate, dangerous and sexually harassing behavior at work. Plaintiff Muza recommended that only male Companions be placed with Draghi.

196.    Despite Defendants having independently come to the same conclusion a year before, as expressed in their email on the subject to Plaintiff Peet in June 2023—Defendants did not agree to Plaintiff Muza's request and continued not to implement a simple safety measure that they themselves had thought up.

197.    On the call, Plaintiff Muza told Noone about her call with Bauer, where Bauer claimed that Duet did not inform her about the first incident where Draghi dropped his pants.

198.    Noone informed her that Duet had told Bauer about the prior incident.

199.    During that call, Plaintiff Muza asked for a new client.

200.    Noone did not reference the anti-harassment policy or say she would begin an investigation, nor did she say she would speak with Mr. Draghi, nor did she offer Plaintiff Muza a different assignment to replace the day she was losing directly as a result of the harassment, in order to reduce the risk of potential harm to her.

201.    That same day, Plaintiff Muza emailed Gerndt and Noone to summarize the basic, but not all, of the points discussed on the phone with Noone, stating that this inappropriate behavior was part of a larger pattern in which  Draghi would make comments about the Plaintiff's physical attractiveness, his desire to be in a romantic relationship together, asking if he could pretend she was his girlfriend, requesting hugs, calling her by the nickname "Mrs. Draghi," and calling her "babe" regularly, among other things.   In her email, Ms. Muza expressed her concern for the safety of other female employees in Draghi's home and asked what the company was doing to address it.  That day, when Ms. Muza spoke to Noone about the incident via phone, she recommended that Draghi not be placed with female companions for their safety, and expressed her desire to drop a shift from Draghi entirely for mental health reasons, as well as that she was taking a mental health day for her upcoming shift with him, and noted that she couldn't lose my remaining shifts for financial reasons.

202.    As Defendants had done to Plaintiff Peet, again in response to repeated complaints by Plaintiff Muza they failed to take action toward Draghi, despite his repeated and clear violation of the law and the Company's harassment policy.

203.    As Defendants had done to Plaintiff Peet, it was entirely incumbent on Ms. Muza to maintain her hours and keep herself safe.

204.    Plaintiff  Muza's complaint was made, just as Plaintiff Peet's had been  pursuant to the policy handbook which requires that unsafe conditions, discrimination, and harassment be reported promptly and without fear of retaliation.

205.    On or around June 11, 2024, Noone emailed Plaintiff Muza with Gerndt cc-ed. She confirmed that the Employer would be in touch with Plaintiff Muza about her schedule. She did not address Plaintiff Muza's other concerns or offer her paid leave.

206.    Plaintiff Muza could not afford to go without work. As a result, Plaintiff Muza

kept working with Draghi for two eight-hour shifts a week because neither Gerndt or Noone offered her an alternative schedule or client.

207.    On or about July 2, 2024, by email to Gerndt and Noone, Plaintiff Muza reiterated her concerns for the general safety of other workers in the client's home after learning from the client that he had inappropriately touched another worker, Plaintiff Sacha Peet, who was no longer assigned to him. Plaintiff Muza asked Noone how she was going to ensure the safety of other staff and any female staff who would replace her in the client's home.

208.    On or about July 3, 2024, by email, Noone denied that the situation posed a threat to the staff.

209.    Noone made this false statement even as Plaintiff Sacha Peet had been sexually harassed and this was known to Defendants. She did not address assigning Plaintiff Muza to a new client, despite her prior requests. She kept working with Draghi for two shifts a week because she could not afford to stop.

210.    On or about July 22, 2024, Noone responded by email to Plaintiff Muza, minimizing and misstating her complaints, stating that no other staff were bothered -- even as Plaintiff Peet had previously complained about Draghi and had been subject to retaliation in reduced hours and ultimately retaliatory termination, and that they preferred to reassign Plaintiff Muza to another client but provided no reassignment.

211.    On or about July 29, 2024, Plaintiff Muza wrote to Noone by email stating that she was "describing a serious workplace issue" that implicated the safety of herself and other workers that was part of a pattern of sexual harassment by Draghi of companions which was known to the company, including but not limited to through reports by Plaintiff Muza and other workers, and that the matter was being "swept under the rug."

212.    Just as happened with Plaintiff Peet's complaints, no investigation had occurred

regarding    Plaintiff Muza's complaint or those of other workers. She requested that the matter be referred to HR.

213.    On or about August 5, 2024, Plaintiff Muza reached out to Defendant Kyle Budinscak ("Budinscak"), Duet's Managing Director and owner, by phone. They discussed her safety concerns about working with Draghi due to the sexual harassment she had suffered and also her concerns about the safety of other workers, as she had previously raised. During the call, Budinscak acknowledged that the Employer was aware of numerous instances where Draghi behaved inappropriately with women Companions. Plaintiff Muza expressed that the Employer should consider assigning male Companions to Draghi to avoid further incidents of sexual harassment. Budinscak confirmed that other women employees had stopped taking assignments with Draghi due to his inappropriate behavior and stated that the company would nonetheless continue to honor Mr. Draghi's request to only be placed with female companions.

214.    Defendant Budinscak did not reference the anti-harassment policy nor did he say he would begin an investigation—even as Plaintiffs had made multiple reports and clearly he was aware of others; nor did he say he would speak with Draghi; nor did he offer Plaintiff Muza a different assignment or paid leave. He said only that Duet was considering what response would be appropriate moving forward.

215.    While Defendant Budinscak stated he was considering an appropriate response, Defendant Noone had previously stated to Plaintiff Peet that action would be taken were further escalations to occur. When the harassment recurred and such escalations did occur,  Defendants continued to condone  the harassment, failed to enforce their policies and instead targeted the victims, their employees.

216.    Indeed, Defendant Budinscak then stated that he would be taking Plaintiff Muza off the case immediately, just as Defendants had done with Plaintiff Peet. He provided no

additional placement at that time.

217.    In the interim, while Defendants failed to take any corrective action or even speak with Mr. Draghi to address his behavior, Draghi continued his unwanted advances towards Plaintiff Muza daily.

218.    On or around August 5, 2024, Gerndt called Plaintiff Muza and told her that Defendants decided to remove her from her shifts with Draghi. Plaintiff Muza never worked another shift with Draghi.

219.    On or around August 7, 2024, Noone emailed Plaintiff Muza and cc-ed Gerndt, confirming that Defendants would not assign Plaintiff Muza to shifts with Draghi.

220.    Plaintiff Muza responded to Noone's email that same day. She reiterated her concerns about Duet's response to her reports about Draghi and expressed concerns about being entirely removed from her current shifts without being reassigned. The Defendants did not offer to put her on paid leave in response to her concerns.

221.    On or around August 7, 2024, Defendant Budinscak emailed Plaintiff Muza and cc-ed Noone and Gerndt. Budinscak confirmed that the Employer was removing her from her assignment with Draghi, stating, "While it may be inconvenient to lose those work hours, it is our judgment that you should not return to work with John."

222.    At this time Duet provided no reassignment, and additionally, Budinscak expressed concerns about Plaintiff Muza's criticisms of the company, indicating they were unwelcome.

223.     In Plaintiff Muza's retaliatory reduction in hours, the Company followed the same playbook they used with Plaintiff Peet.

224.    From around August 2024 to around September 23, 2024, Plaintiff Muza covered isolated shifts for other Companions on an irregular basis. She was never reinstated to an

equivalent position that she held prior to or during the time she reported sexual harassment and safety concerns. After her constructive discharge, she was not offered an unconditional offer of reinstatement to four days or 32 hours per week at any time. Nor did Plaintiff Muza receive assurances that Duet was now enforcing its harassment or retaliation policy. Indeed, Plaintiff Muza was offered at most only 10 hours per week. She thus was never offered suitable reinstatement.

225.    Plaintiff Muza only went down from working four days to two days per week due to the harassment she suffered.

226.    Plaintiff Muza was thus subjected to a retaliatory reduction in hours and a retaliatory wrongful termination due to her statements reporting sex harassment, reporting a safety condition that she reasonably believed posed a danger to other female employees, and which she believes constituted a violation of various laws.

227.    That is, Defendants retaliated against both Plaintiffs by cutting their schedules and not providing new clients to them after they made their complaints about Mr. Draghi, and regarding failure to keep workers safe.

228.    Duet never told Plaintiffs that there was no work available for them.

229.    Indeed, Defendant Duet represents itself as a growing business and has a wide variety of clients and consistently hires new employees to meet the demand.

230.    For example, when Plaintiff Muza first began at Duet, the company portrayed itself as having a wide variety of clients.

231.    During Plaintiff Peet's employment, Duet's management told her they had many clients.

232.    In its advertising to potential employees, Duet stated that companions could work potentially 40 hours or a couple of shifts a week. Duet never mentioned limited hours or

clients.

## FIRST CLAIM FOR RELIEF
## (FLSA MINIMUM WAGE CLAIM, 29 U.S.C. §§ 201 *ET SEQ.*, BROUGHT BY PLAINTIFFS MUZA AND PEET ON BEHALF OF THEMSELVES AND THE FLSA COLLECTIVE PLAINTIFFS)

233.    Plaintiffs on behalf of themselves and the FLSA Collective Plaintiffs repeat, reallege, and incorporate each and every preceding paragraph as if set forth fully herein.

234.    At all times relevant, each Defendant has been, and/or continues to be, an "employer" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of FLSA, 29 U.S.C. § 203.

235.    At all times relevant, Defendants employed Plaintiffs and FLSA Collective Plaintiffs as "employees" within the meaning of FLSA, 29 U.S.C. § 203.

236.    Defendants were required to pay Plaintiffs and the FLSA Collective Plaintiffs at a rate not less than the minimum wage rate under the FLSA for all hours worked.

237.    Upon information and belief, Defendants knowingly failed to pay Plaintiffs and the FLSA Collective Plaintiffs the required minimum wage under the FLSA for orientation and communications to case managers and the main office outside of scheduled client shifts.

238.    Plaintiffs, on behalf of themselves and the FLSA Collective Plaintiffs seek damages for their unpaid compensation, liquidated damages as provided by the FLSA, attorneys' fees and costs, along with such other relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION
## (NEW YORK STATE MINIMUM WAGE ACT - NYLL  § 650 ET SEQ., 12 NYCRR § 142-2.3 BROUGHT BY PLAINTIFFS ON BEHALF OF THEMSELVES AND THE MINIMUM WAGE  CLASS)

239.    Plaintiffs on behalf of themselves and those similarly situated, repeat, reallege, and incorporate each and every preceding paragraph as if set forth fully herein.

240.    Throughout the period covered by the applicable statute of limitations and upon information and belief, Defendants willfully and repeatedly failed to pay Plaintiffs for orientation, and work-related calls with their supervisors outside of their client shifts.

241.    This failure was done as part of widespread policy and/or practice applicable to all hourly workers within the applicable period.

242.    Plaintiffs seek and are entitled to recover their  respective unpaid compensation, damages pursuant to NYLL, attorneys' fees, costs, pre-and post-judgment interest along with such other relief as this Court deems just and proper on behalf of herself and the Class.

243.    Plaintiffs have been damaged in an amount as yet determined, plus liquidated damages.

### THIRD CAUSE OF ACTION
### (NEW YORK STATE MINIMUM WAGE ACT - NYLL § 650 ET SEQ., 12 NYCRR § 142-2.3 BROUGHT BY PLAINTIFFS ON BEHALF OF THEMSELVES AND THE CALL-IN PAY CLASS)

244.     Plaintiffs on behalf of themselves and those similarly situated, repeat, reallege, and incorporate each and every preceding paragraph as if set forth fully herein.

245.    Throughout the period covered by the applicable statute of limitations and upon information and belief, Defendants willfully and repeatedly failed to pay Plaintiffs for four hours minimum wage, for all shifts lasting less than four hours, as required by 12 NYCRR § 142-2.3 including but not limited to calls with potential clients and the 2 hour orientation for example.

246.    This failure was done as part of widespread policy and/or practice applicable to all hourly workers within the applicable period.

247.    Plaintiffs seek and are entitled to recover their respective unpaid compensation, damages pursuant to NYLL, Article 6 198, attorneys' fees, costs, pre- and post-judgment interest

along with such other relief as this Court deems just and proper on behalf of themselves and the Class.

248.    Plaintiffs have been damaged in an amount as yet determined, plus liquidated damages.

## FOURTH CAUSE OF ACTION
## (GENDER DISCRIMINATION-- HARASSMENT AND HOSTILE WORK ENVIRONMENT AGAINST DEFENDANT PEAK OUTCOMES LLC ("DUET")  BY PLAINTIFFS INDIVIDUALLY

249.    Plaintiffs on behalf of themselves, repeat, reallege, and incorporate each and every preceding paragraph as if set forth fully herein.

250.    Defendant Duet has discriminated against Plaintiffs on the basis of their gender in violation of the New York City Human Rights Law ("NYCHRL") by subjecting them to a hostile work environment and sexual harassment created by their client Draghi, whose acts they condoned and failed to remedy.

251.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

## FIFTH  CAUSE OF ACTION
## (RETALIATION IN VIOLATION OF THE NYCHRL AGAINST ALL DEFENDANTS BY PLAINTIFFS INDIVIDUALLY)

252.    Plaintiffs on behalf of themselves, repeat, reallege, and incorporate each and every preceding paragraph as if set forth fully herein.

253.    By the actions described above, among others, all Defendants, retaliated against Plaintiffs on the basis of their protected activities in violation of the NYCHRL by cutting their schedules and subjecting them to wrongful termination after they reported the harassment they suffered.

254.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or other economic harm for which they are entitled to an award of monetary damages and other relief.

## SIXTH CAUSE OF ACTION
### (RETALIATION IN VIOLATION OF THE NYLL 740 AGAINST ALL DEFENDANTS BY PLAINTIFFS INDIVIDUALLY)

255.    Plaintiffs on behalf of themselves, repeat, reallege, and incorporate each and every preceding paragraph as if set forth fully herein.

256.    By the actions described above, among others, Defendants retaliated against Plaintiffs on the basis of their protected activities in violation of the NYLL 740 by subjecting them to reduced hours and ultimately wrongful termination because of their protest of and objection to employee safety hazards created by client John Draghi, and Plaintiff Peet's complaint regarding the handling of COVID safety precautions.

## SEVENTH CAUSE OF ACTION
### (NYCHRL AIDING AND ABETTING AGAINST DEFENDANT DENISE BAUER)

257.    Plaintiff Muza repeats and realleges all the allegations in this complaint as though fully set forth herein.

258.    Under the NYCHRL, it is an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so.

259.    Based on the foregoing factual allegations, Defendant Bauer knew of her brother, John Draghi's sexual harassment of Plaintiff Muza. Defendant Bauer refused to allow male companions to work with Mr. Draghi.

260.    As a direct and proximate result of Defendant Bauer aiding and abetting,

Plaintiff Muza suffered unlawful retaliatory conduct in violation of the NYCHRL. Plaintiff

Muza suffered significant economic loss and emotional distress. Plaintiff Muza continues to

suffer monetary and/or economic harm, including, but not limited to, loss of future income,

compensation and benefits, for which she is entitled to an award of damages.

## <u>RELIEF SOUGHT</u>

261.     **WHEREFORE**, Plaintiffs request relief as follows:

A.  Designation of this action as a collective action for the purposes of the claims
brought on behalf of the FLSA Collective Plaintiffs along with prompt issuance of
opt-in notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of
the opt-in class;

B.  Designation of Plaintiffs as representatives of the FLSA Collective Plaintiffs;

C.  Designation of this action as a class action pursuant to Rule 23 of the Fed. R. Civ.
P. and the NYLL  for the purposes of the claims brought on behalf of the Class
members;

D.  Designation of Plaintiffs as representatives of the Class;

E.  An order declaring that Defendants violated the FLSA in the manners stated in this
complaint;

F.  An order declaring that Defendants' violations of the FLSA were willful;

G.  An order declaring that Defendants violated the NYLL in the manners stated in
this complaint;

H.  An order declaring that Defendants' violations of the NYLL were willful;

I.  An award of minimum wage compensation under the FLSA and NYLL;

J.  An award of liquidated damages pursuant to the FLSA and the NYLL;

K.  An award of damages for violations of NYLL;

L.  All relief pursuant to NYC Human Rights Law for Plaintiffs' emotional distress and compensatory damages;

M.  An award of damages for violations of NYCHRL;

N.  An award of damages for violations of NYLL 740;

O.  All penalties available under the applicable laws;

P.  Attorneys' fees pursuant to 29 U.S.C. § 216, NYLL § 663, NYLL § 194(1), the NYCHRL and all other applicable statutes;

Q.  Interest as provided by law; and

R.  Such other relief as this Court deems just and proper.


## JURY TRIAL

Plaintiffs demand a jury trial for all causes of action and claims for which they have a right to a jury trial on all issues of facts and damages.

Dated: Brooklyn, New York
      April 18, 2025

                   Respectfully submitted,

                   JULIEN MIRER & ASSOCIATES, PLLC
                   _____/s/_____
                   By: Ria Julien
                   Jeanne Mirer
                   Heather Ramirez
                   *Attorneys for Plaintiff*
                   300 Cadman Plaza West, 12th floor
                   New York, NY 10038
                   (212) 231-2235
                   rjulien@julienmirer.com
                   jmirer@julienmirer.com
                   hramirez@julienmirer.com